[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14524

_____

D.C. Docket No. 0:12-cv-62140-RNS


SEMINOLE TRIBE OF FLORIDA,
a Federally recognized Indian Tribe,

Plaintiff - Appellee,

versus

MARSHALL STRANBURG,
Interim Executive Director And Deputy Executive Director,

Defendant - Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 26, 2015)

Before MARTIN and ROSENBAUM, Circuit Judges, and COOGLER,[*] District
Judge.

ROSENBAUM, Circuit Judge:

---

[*]    Honorable L. Scott Coogler, United States District Judge for the Northern District of
Alabama, sitting by designation.

Benjamin Franklin said, "[I]n this world nothing can be said to be certain, except death and taxes."[1]  He was almost right.  As this case illustrates, even taxes are not certain when it comes to matters affecting Indian tribes.  In this appeal, we consider whether Florida's Rental Tax and Florida's Utility Tax, as applied to matters occurring on Seminole Tribe lands, violate the tenets of federal Indian law.  For the reasons that follow, we find that the Utility Tax as it involves activities on Tribe land does not, but the Rental Tax does.

## I. Background

### A.  Factual Background

The Seminole Tribe of Florida ("the Tribe") is a federally recognized Indian tribe with multiple reservations in Florida, including one near the city of Hollywood and one near the city of Tampa.  The Tribe operates casinos on its Hollywood and Tampa reservations.

In May 2005, the Tribe entered into 25-year leases with two non-Indian corporations—Ark Hollywood, LLC, and Ark Tampa, LLC ("the Ark Entities")— to provide food-court operations at each casino.  The leases required the Ark Entities to pay "to the applicable Federal, tribal and/or Florida governmental authority, any and all sales, excise, property and other taxes levied, imposed or

---

[1]    Letter from Benjamin Franklin to Jean-Baptiste Le Roy (Nov. 13, 1789), *in* 12 THE WORKS OF BENJAMIN FRANKLIN 160, 161 (John Bigelow, ed., Federal ed. 1904) (1888).

2

assessed."[2]   Through the Bureau of Indian Affairs ("BIA"), the Secretary of the Interior approved the leases, as required by statute.

The State of Florida taxes commercial rent payments (the "Rental Tax"). *See* Fla. Stat. § 212.031.   Florida describes the Rental Tax as a tax on the "privilege [of engaging] in the business of renting, leasing, letting, or granting a license for the use of any real property" in the state. *Id.* § 212.031(1)(a).   The tax is assessed against the lessee based on the total amount of rent paid. *Id.* § 212.031(1)(c), (2)(a).   Under the law, the landlord collects and remits the tax to the state and is liable to pay the tax and incur penalties if it fails to perform these duties. *Id.* § 212.031(3); *see id.* § 212.07(2), (3).   The tax itself constitutes a lien on the personal property of the lessee, and not, apparently, the land or property of the lessor. *Id.* § 212.031(4).

---

[2]     The text of the lease provides,

> Tenant shall pay . . . to the applicable Federal, tribal and/or Florida governmental authority, any and all sales, excise, property and other taxes levied, imposed or assessed with respect to (i) the occupancy by Tenant of space on Reservation Land, (ii) the operation of Tenant's business, (iii) Tenant's inventory, furniture, trade fixtures, apparatus, equipment, and all leasehold improvements installed by Tenant or by Landlord on behalf of Tenant (except to the extent such leasehold improvements shall be covered by Taxes referred to in Section 6.1) and any other property of Tenant, and/or (iv) utility services provided to Tenant at the Premises (except those provided by Landlord), including, without limitation, [Broward County/Hillsborough County] taxes on electricity, gas, water and telecommunication services.

Florida also imposes a tax "on gross receipts from utility services that are delivered to a retail consumer" in Florida ("the Utility Tax").  *See* Fla. Stat. § 203.01(1)(a)(1) (2012).[3]  The statute permits a utility provider, at its discretion, to separately state this Utility Tax as a line item on the customer's bill but does not require it to do so.  *See id.* § 203.01(4).  If the provider does separately state the tax on the bill, the statute requires the consumer to remit the tax to the service provider and states that the tax becomes part of the debt owed to (and recoverable by) the service provider.  *Id.*  The statute clarifies, though, that the "tax is imposed upon every person for the privilege of conducting a utility or communications services business, and each provider of the taxable services remains fully and completely liable for the tax, even if the tax is separately stated as a line item or component of the total bill."  *Id.* § 203.01(5).

Similarly, Florida's administrative regulations specify that even when stated on the consumer's bill, the "tax is imposed on the privilege of doing business, and it is an item of cost to the distribution company," who "remains fully and completely liable for the payment of the tax, even when the tax is wholly or partially separately itemized on the customer's bill."  Fla. Admin. Code R. 12B-6.0015(3)(a).  A service provider may, however, claim a credit or refund for net

---

[3]    A new version of the utility tax statute took effect on July 1, 2014, with minor changes in language that are not relevant to this lawsuit.  Act of May 12, 2014, ch. 38, sec. 4, 2014 Fla. Laws 4-9.  We cite language from the version that was in effect at the time the Tribe filed its lawsuit in October 2012.

4

uncollected billings when it prepays the tax to the state based on gross billings, as opposed to actual gross receipts. Fla. Admin. Code R. 12B-6.005(1)(e). A service provider who fails to remit the tax to the state is also guilty of a misdemeanor. Fla. Stat. § 203.01(6).

Florida assessed the Rental Tax against the Ark Entities for the period of July 2005 through June 2008. The Tribe has paid the Utility Tax stated as a component of its utility bill. Although the Tribe applied to the Florida Department of Revenue for a refund of the amount of the Utility Tax it paid beginning in 2008 through July 2011, it was denied a refund. The Ark Entities also applied for a refund of the Rental Tax, which was denied.

## B. Procedural History

Following these denials, on October 30, 2012, the Tribe filed a federal complaint against the State of Florida and Marshall Stranburg, the interim Executive Director of the Florida Department of Revenue,[4] seeking declaratory and injunctive relief. Within the next few days, the Ark Entities filed suits in the Florida state courts contesting the denials of their refunds. Both state cases were still pending at the time this appeal was filed, although the case related to the Hollywood casino was apparently stayed pending the disposition of the federal case.

---

[4]     Stranburg was appointed the Executive Director of the agency on April 23, 2013.

5

Stranburg sought dismissal of the Tribe's federal complaint on multiple grounds, including "the abstention doctrine and the principles of exhaustion and comity." The United States District Court for the Southern District of Florida rejected the abstention argument, noting that "this case involves a different plaintiff, seeking prospective injunctive relief and declaratory relief unrelated to Ark Hollywood's and Ark Tampa's requested refund. This Court will not shirk its obligation to adjudicate this matter, when it so clearly has jurisdiction over the issues presented." Stranburg did not raise the comity or abstention issue again in the district court.[5]

After conducting limited discovery, the parties cross-moved for summary judgment. The district court granted summary judgment in favor of the Tribe on all of its claims. With respect to the Rental Tax, the court concluded that 25 U.S.C. § 465 expressly prohibits the Rental Tax because the Rental Tax is a tax on Indian land rights. *See Seminole Tribe of Fla. v. Florida*, 49 F. Supp. 3d 1095, 1097-98 (S.D. Fla. 2014). The district court also held in the alternative that if the statute did not expressly prohibit the Rental Tax, the tax was nonetheless preempted by federal law and impermissibly interfered with tribal sovereignty. *Id.* at 1098-102. In reaching this holding, the district court gave deference, short of

---

[5] The district court dismissed the State of Florida as a defendant based on Eleventh Amendment immunity grounds.

full *Chevron* deference, to BIA regulations that prohibit taxes on leases of Indian land. *See id.* at 1099-100.

As for the Utility Tax, the district court similarly found it to be impermissible. In particular, the court reasoned that the legal incidence of the Utility Tax fell on the Tribe, not on the utility company, and federal law generally prohibits taxing Indians for on-reservation activities. *See id.* at 1103-08.

Stranburg now appeals the district court's rulings. With respect to the Rental Tax, Stranburg contends that the district court erred both in finding a statutory prohibition of the tax and federal preemption of the tax. Stranburg also revives his comity argument, asserting that the district court should never have adjudicated the Rental Tax claim while the Ark Entities' state-court cases were pending.

Stranburg further contends that the district court erred in determining the legal incidence of the Utility Tax to be on the Tribe rather than on the utility company. Because, in Stranburg's view, the tax falls on the utility company, he argues that the district court should have conducted a preemption inquiry. With the benefit of the parties' briefs and oral argument, we now affirm in part and reverse in part.

## II. Standards of Review

We review a district court's grant of summary judgment *de novo*, considering all the evidence and viewing facts in the light most favorable to the non-moving party. *Morales v. Zenith Ins. Co.*, 714 F.3d 1220, 1226 (11th Cir. 2013). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A court should grant summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

We review a district court's ruling on abstention for an abuse of discretion. *Ambrosia Coal & Constr. Co. v. Pagés Morales*, 368 F.3d 1320, 1332 (11th Cir. 2004). A district court abuses its discretion if it misapplies the law or makes findings of fact that are clearly erroneous. *Id.* (citations omitted).

## III. Florida's Rental Tax

Stranburg contends on appeal that the district court erred in finding the Ark Entities statutorily exempt from Florida's Rental Tax, in its alternative holding that federal law preempts the Rental Tax, and in its failure to dismiss the Tribe's challenge on comity grounds. After carefully considering this issue of first impression in our Circuit, we conclude that the district court correctly interpreted 25 U.S.C. § 465 to preclude Florida from collecting its Rental Tax on the rent

8

payments made by non-Indian lessees of protected Indian reservation land. Although Stranburg's arguments are not without some appeal, we nonetheless find that the Tribe's interpretation best comports with the statutory text and purpose, the relevant Supreme Court case law, and the general canon that statutes be construed in Indians' favor.  Accordingly, we affirm the district court on this basis.

We further hold that, even if the statutory exemption did not apply, federal law preempts the Rental Tax in this case under the balancing inquiry outlined in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S. Ct. 2578 (1980). While we respectfully disagree with the district court's application of the *Bracker* inquiry because it relied on a conclusion of preemption promulgated by the Secretary of the Interior instead of conducting its own particularized inquiry, we nonetheless affirm the ultimate preemption holding based on a *de novo Bracker* analysis of the record before us.

## *A. Statutory Exemption*

The district court concluded that 25 U.S.C. § 465 barred Florida from assessing its Rental Tax against the non-Indian lessees of the Tribe's reservation land.  The district court, as does the Tribe on appeal, relied heavily on the Supreme Court's decision in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S. Ct. 1267 (1973), for the proposition that § 465 prohibits taxes on land rights that are so

connected to the land that the tax amounts to a tax on the land itself. We agree with the district court's analysis.

The Indian Reorganization Act of 1934 was passed by Congress with the intent of "rehabilitat[ing] the Indian's economic life and [giving] him a chance to develop the initiative destroyed by a century of oppression and paternalism," through, among other things, giving tribes greater control over their affairs and property. *See Mescalero*, 411 U.S. at 152, 93 S. Ct. at 1272 (citations and internal quotation marks omitted). Section 5 of the Act, codified at 25 U.S.C. § 465, has been described as the "capstone" of the Indian Reorganization Act's land provisions, provisions that were designed to improve Indians' economic standing through the use of land acquired by the Secretary of the Interior "with at least one eye directed toward how tribes will use those lands to support economic development." *See, e.g.*, *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2211 (2012). Accordingly, Section 5 of the Act authorizes the Secretary "to acquire . . . any interest in lands, water rights, or surface rights to lands . . . for the purpose of providing land for Indians." 25 U.S.C. § 465. The statute provides that title to the land or rights acquired will be taken by the United States in trust for the Indian tribe and that "such lands or rights

10

shall be exempt from State and local taxation."[6]  *Id.*  The Supreme Court has held

that, "[o]n its face, the statute exempts land and rights in land" from state taxation.

*Mescalero*, 411 U.S. at 155, 93 S. Ct. at 1274.

In *Mescalero*, the Indian plaintiffs operated a ski resort on off-reservation

land in New Mexico that was developed under the 1934 Act.[7]  *Id.* at 146, 93 S. Ct.

at 1269.  New Mexico sought to levy two taxes related to the ski resort:  a gross-

receipts tax from the sale of services and tangible property at the resort and a use

tax based on the purchase price of materials used to construct two ski lifts at the

resort. *Id.* at 147, 93 S. Ct. at 1269-70.  The Supreme Court first rejected a blanket

characterization of the resort as a "federal instrumentality" that would be exempt

from all state taxation, *id.* at 150-55, 93 S. Ct. at 1271-74, and then considered the

language from § 465.

In analyzing § 465's application to the gross-receipts tax, the Court observed

that while the statute precluded taxes on land or on rights in land, it did not exempt

from state taxation the income derived from the use of the land.  *Id.* at 155, 93 S.

Ct. at 1274.  The Court first noted that tax exemptions are not granted by

implication and then recalled that not all state and federal taxes on Indians are

---

[6]    Stranburg does not appear to contest that the Tribe's Hollywood and Tampa reservations qualify as land acquired and held in trust under this statute.

[7]    The land was actually leased from the United States Forestry Service, but the Court found that the land fell under § 465 despite its unique provenance. *See* 411 U.S. at 155 n.11, 93 S. Ct. 1274 n.11.

11

categorically barred. *Id.* at 156-57, 93 S. Ct. at 1274-75. For example, the Court cited its prior decisions in *Choteau v. Burnet*, 283 U.S. 691, 51 S. Ct. 598 (1931), and *Leahy v. State Treasurer*, 297 U.S. 420, 56 S. Ct. 507 (1936), in which the Court upheld, respectively, federal and state income taxes on income derived from oil, gas, and mineral exploration on Indian lands after that income was distributed from a federal trust fund to individual Indians. In those cases, the Supreme Court decided, in part, that income distributed to individual Indian tribe members and freely useable by them was taxable even when the source of that income was exempt from taxation. *See Choteau*, 283 U.S. at 696-97, 51 S. Ct. at 600-01; *Leahy*, 297 U.S. at 421, 56 S. Ct. at 507. Ultimately, the *Mescalero* Court likened the gross-receipts tax to these taxes on income, as opposed to a tax on property, and found that it was not barred by § 465. 411 U.S. at 157, 93 S. Ct. at 1275.

In contrast, the Court did hold that § 465 prohibited the state's use tax on the ski-lift materials. The Court observed that under the statute, "these permanent improvements on the Tribe's tax-exempt land would certainly be immune from the State's ad valorem property tax." *Id.* at 158, 93 S. Ct. at 1275. As the Court explained, use "is among the 'bundle of privileges that make up property or ownership' of property and, in this sense, at least, a tax upon 'use' is a tax upon the property itself." *Id.* (citation omitted). While conceding that not all use taxes could be viewed as property taxes, the Court concluded that "use of permanent

12

improvements upon the land is so intimately connected with use of the land itself that an explicit provision relieving the latter of state tax burdens must be construed to encompass an exemption for the former." *Id.* at 158, 93 S. Ct. at 1275-76.

In our view, *Mescalero* stands for the proposition that § 465 precludes state taxation of that "bundle of privileges that make up property or ownership of property." *See id.* at 158, 93 S. Ct. at 1275 (citation and internal quotation marks omitted). The ability to lease property is a fundamental privilege of property ownership. *See, e.g.*, *Terrace v. Thompson*, 263 U.S. 197, 215, 44 S. Ct. 15, 17-18 (1923) (noting that "essential attributes of property" include "the right to use, lease, and dispose of it for lawful purposes"). By taxing the "privilege" of "engag[ing] in the business of renting, leasing, letting, or granting a license for the use of any real property," the State of Florida is taxing a privilege of ownership just as New Mexico's tax in *Mescalero* taxed the privilege of use.

Stranburg attempts to overcome this analysis in several ways. First, he tries to distinguish the Rental Tax from the tax in *Mescalero* and limit the holding of that case. Next, he asserts that the Supreme Court has foreclosed the district court's reading of *Mescalero* with its decision in *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 109 S. Ct. 1698 (1989). And finally, he relies on caselaw from the Ninth Circuit purportedly upholding a similar tax in California. We find none of Stranburg's arguments ultimately persuasive.

13

1.    The Rental Tax Is Not Materially Distinguishable from the Use Tax in
      *Mescalero* that the Supreme Court Determined Violated § 465

Stranburg's efforts to distinguish the Rental Tax from the tax at issue in *Mescalero* gain no traction.  Specifically, Stranburg characterizes the Rental Tax as a "transactional tax on the payment of rent" and likens it more to the gross-receipts tax in *Mescalero* as a tax on income rather than on the land.[8]  And, of course, the Tribe receives income from the rent payments.

But these payments secure a lessee's possessory interest *in the land* for the duration of the lease.  *See generally Winters Coal Co. v. Comm'r*, 496 F.2d 995, 998 (5th Cir. 1974) (plurality op.) ("There is little conflict or disagreement with the old hornbook principle that a lease is a conveyance and creates in the lessee an estate which entitles him to exclusive possession unless certain rights are reserved by the lessor."); *Lease*, Black's Law Dictionary (10th ed. 2014) ("A contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, usu[ally] rent").  Just as the use of

---

[8]    Although Stranburg analogizes rent to income derived from the land, elsewhere, he is careful to describe the legal incidence of the Rental Tax as falling on the payments by the non-Indian lessees rather than on the Tribe's income.  His reasons for doing so are well-founded, as states generally may not tax Indian tribes for on-reservation activities.  *See Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458, 115 S. Ct. 2214, 2220 (1995).  We assume for this opinion that Stranburg is correct that the legal incidence of Florida's Rental Tax falls on the non-Indian lessees, an assumption not challenged by the Tribe.  Even so, our conclusion does not change.  By the plain text of the statute, the tax exemption contained in § 465 attaches to the land and the rights in that land protected under the statute.  *See* 25 U.S.C. § 465 ("[S]uch *lands or rights* shall be exempt from State and local taxation." (emphasis added)).  So, even if the legal incidence of the Rental Tax falls on the Ark Entities, the tax itself is expressly precluded because a tax on the payment of rent is indistinguishable from an impermissible tax on the land.

14

permanent improvements on land "is so intimately connected with use of the land itself," *Mescalero*, 411 U.S. at 158, 93 S. Ct. at 1275, payment under a lease is intimately and indistinguishably connected to the leasing of the land itself. And in this respect, the Rental Tax is distinguishable from the gross-receipts sales tax in *Mescalero* or the severance and excise taxes discussed in cases like *Cotton Petroleum*, 490 U.S. at 168-69 & n.4, 109 S. Ct. at 1703, or *Oklahoma Tax Commission v. Texas Co.*, 336 U.S. 342, 345-47, 69 S. Ct. 561, 563-64 (1949).[9] Florida's Rental Tax is a tax on *a right in land*, while the others tax economic

---

[9] *Cotton Petroleum*, which is discussed more fully below, involved a challenge to five taxes levied by New Mexico on the production of oil and gas from leased Indian lands. 490 U.S. at 168-69 & n.4, 109 S. Ct. at 1703 & n.4. *Texas Co.* involved a challenge by non-Indian lessees to two Oklahoma taxes, one a tax on the gross production value of oil and gas and the other an excise tax on every barrel of oil produced in the state. 336 U.S. at 345-47, 69 S. Ct. at 563-64. In *Texas Co.*, the Oklahoma Supreme Court had invalidated the taxes on the basis that the lessees were instrumentalities of the Federal government. *Id.* at 348, 69 S. Ct. at 565. In reversing the state supreme court, the United States Supreme Court noted that intergovernmental immunity did not extend tax immunity to property or gains earned by private persons under a lease of restricted Indian land. *Id.* at 363, 69 S. Ct. at 572. Although the Court's holding rested on interpreting the intergovernmental-immunity doctrine, significantly, the Court emphasized in *Texas Co.* that the case "present[ed] no question concerning the immunity of the Indian lands themselves from state taxation," *id.* at 353, 69 S. Ct. at 567, and distinguished the taxable nature of oil removed from the land itself, *see, e.g.*, *id.* at 354, 358, 69 S. Ct. at 568, 570.

In its discussion of New Mexico's gross-receipts tax, *Mescalero* also cited *Texas Co.* for the proposition that "[l]essees of otherwise exempt Indian lands are also subject to taxation." *Mescalero*, 411 U.S. at 157, 93 S. Ct. at 1275. Stranburg seizes on this statement as a declaration that *all* lessees of Indian land are subject to *all* state taxation. But Stranburg's assertion ignores both the context of *Mescalero*—where the statement was included in the discussion of the gross-receipts tax, and not the tax on land—and the context of *Texas Co.*— which dealt with taxes on oil that had been removed from the land. Accordingly, the citation to *Texas Co.* in *Mescalero* does not have the reach Stranburg attributes to it and stands for the now uncontroversial proposition that non-Indian lessees of Indian land may be subject to some state taxation. *See, e.g.*, *Cotton Petroleum*, 490 U.S. at 175, 109 S. Ct. at 1707.

15

activity (sales receipts) or tangible property (oil or gas) removed by one or more degrees from the land.

Additionally, to the extent any ambiguity exists with respect to the tax exemption contained in § 465, resolving that ambiguity in favor of the Tribe comports with the long-standing canon that statutes be construed liberally in favor of Indians. *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S. Ct. 2399, 2403 (1985) (citations omitted) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."). We acknowledge that the Supreme Court has cautioned that this canon "is offset by the canon that warns us against interpreting federal statutes as providing tax exemptions unless those exemptions are clearly expressed." *Chickasaw Nation v. United States*, 534 U.S. 84, 95, 122 S. Ct. 528, 535-36 (2001). But no "offset" is warranted here. Unlike a tax exemption purportedly legislated "through an inexplicit numerical cross-reference," *id.* at 90, 122 S. Ct. at 533, § 465 expressly exempts land and rights in that land from state taxation. Any "ambiguity" present centers not around the existence of a tax exemption, but rather the scope of the land rights included within that exemption.

In sum, we find that construing § 465 to preclude Florida's Rental Tax aligns with the text and purpose of the Indian Reorganization Act, the Supreme

16

Court's interpretation of § 465 in *Mescalero*, and the general canon that statutes be construed in Indians' favor.

### 2. *Cotton Petroleum* Does Not Foreclose the Statutory Exemption

Stranburg argues further, though, that even if *Mescalero* can be read to preclude the Rental Tax, that reading was subsequently abrogated by the Supreme Court in *Cotton Petroleum*. We disagree.

In *Cotton Petroleum*, the Supreme Court confronted the question of whether New Mexico could impose taxes on oil and gas produced by non-Indian lessees of wells located on the tribe's reservation. 490 U.S. at 166, 109 S. Ct. at 1702. In answering that question, the Court looked to the Indian Mineral Leasing Act of 1938 ("1938 Act"), 25 U.S.C. § 396a, and its predecessors, which permitted the tribe to lease reservation land for mineral exploitation, subject to approval by the Secretary of the Interior. *Id.* at 167, 109 S. Ct. at 1702.

The Court recounted its shifting doctrines concerning state taxation of non-Indian lessees' oil production, noting that its old rule required the tax to be specifically authorized by Congress, while the new rule upheld the state's tax unless it was "expressly or impliedly prohibited by Congress." *Id.* at 173, 109 S. Ct. at 1706. The "current doctrine" permits a state, absent a grant of tax immunity by Congress, to "impose a nondiscriminatory tax on private parties with whom the

United States or an Indian tribe does business, even though the financial burden of the tax may fall on the United States or tribe." *Id.* at 175, 109 S. Ct. at 1707.

Although the Court found no express discussion of taxation in the 1938 Act, it concluded that the silence of Congress on the issue was explained by the shifting doctrines. As the Court noted, predecessors to the 1938 Act dealing with leasing of Indian lands for mineral exploitation expressly permitted state taxation. *See id.* at 181-83, 109 S. Ct. at 1710-11; *see also* 25 U.S.C. § 398; 25 U.S.C. § 398c. These express authorizations in 1924 and 1927 were in line with the earlier doctrine. But by 1938 the new doctrine was in place, and the Court refused to read the silence of the 1938 Act as either a repeal of the previously authorized state taxes or an implied prohibition on state taxation. *Id.* at 182, 109 S. Ct. at 1710.

Although the *Cotton Petroleum* Court was analyzing the 1938 Act, in a footnote, it commented that the Indian Reorganization Act of 1934, among other Indian-related statutes, "no more express[es] a congressional intent to pre-empt state taxation *of oil and gas lessees than does the 1938 Act*." *Id.* at 183 n.14, 109 S. Ct. at 1711 n.14 (emphasis added). Based on this footnote, Stranburg asserts that the Supreme Court "concluded squarely" that § 465 does not express a congressional intent to preempt state taxation on *all* lessees of Indian land. But Stranburg's argument overlooks the fact that the Supreme Court's comment applies to just oil and gas lessees specifically, which are fundamentally different

18

from general land leases, in that they allow extraction of products from the land. The Court, in this footnote, simply did not address the full scope of § 465's tax exemption. Extending the *Cotton Petroleum* footnote to encompass all lessees of Indian land would ignore both the express text and the larger context of the Court's opinion.

3. The Ninth Circuit's Construction of the Statute

Stranburg also relies heavily on the Ninth Circuit cases of *Agua Caliente Band of Mission Indians v. Riverside County*, 442 F.2d 1184 (9th Cir. 1971), *Fort Mojave Tribe v. San Bernardino County*, 543 F.2d 1253 (9th Cir. 1976), and *Confederated Tribes of Chehalis Reservation v. Thurston County Board of Equalization*, 724 F.3d 1153, 1158 n.7 (9th Cir. 2013), for the proposition that § 465 does not preclude the Rental Tax. In *Agua Caliente*, the Ninth Circuit upheld (over a persuasive dissent that foreshadowed the *Bracker* inquiry) California's possessory-interest tax, which it characterized as a tax on the "full cash value of the lessee's interest" in the land rather than a tax on the "land as such." *See* 442 F.2d at 1186. In *Fort Mojave*, the Ninth Circuit held that another section of the Indian Reorganization Act did not preempt the possessory-interest tax because the tax did not threaten to encumber the Indian's interest. 543 F.2d at 1256. Significantly, neither the *Agua Caliente* nor *Fort Mojave* decisions mentioned or apparently considered § 465 at all.

19

In *Chehalis Reservation*, the Ninth Circuit recently invalidated a Washington state tax on permanent improvements owned by a non-Indian corporation on Indian land acquired under § 465.  724 F.3d at 1157-58.  In a footnote in that opinion, the Ninth Circuit panel commented that the taxes upheld in *Agua Caliente* and *Fort Mojave* were distinguishable from the Washington tax and the New Mexico tax in *Mescalero* because, in the former cases, the state imposed taxes on non-Indian lessees' possessory interests while, in the latter, the states imposed property taxes on the land, which included permanent improvements to the land.  *Id.* at 1158 n.7.

Stranburg argues that after *Chehalis Reservation*, the Ninth Circuit has determined that § 465 "bars state taxes directly on land or on permanent improvements to land, and only those two areas," and urges us to adopt that reading here.  But Stranburg's construction is too narrow.  First, the *Chehalis Reservation* footnote did not limit § 465's application to only land and permanent improvements on land.  Indeed, it recognized that § 465 precluded taxes on land *and on land rights*; it just implicitly decided, without elaboration, that possessory interests were not rights in the land.  *See id.*  Moreover, in *Mescalero,* the Supreme Court itself did not expressly limit its holding to only permanent improvements. The opinion points out that not all "use taxes for all purposes" can be deemed to be property taxes.  *See Mescalero*, 411 U.S. at 158-59, 93 S. Ct. at 1275-76.  The

20

necessary implication is that some use taxes, of which permanent improvements are but one, may be deemed so akin to property taxes that § 465 would bar their imposition.

Further, while the language of the *Chehalis Reservation* footnote suggests that the Ninth Circuit determined in *Agua Caliente* that § 465 did not bar taxes on non-Indian possessory interests of Indian land, the fact remains that neither *Agua Caliente* nor *Fort Mojave* ever analyzed the applicability of § 465 to the possessory interests being taxed.[10]  Thus, even to the extent that a tax on the full-cash value of a lessee's possessory interest can be viewed as analogous to a tax on the payment of rent, we do not find the Ninth Circuit's bare statement in the *Chehalis Reservation* footnote that § 465 does not apply to taxes on such interests to be persuasive.

Diving more deeply into the Ninth Circuit cases similarly does not help Stranburg.  Significantly, *Agua Caliente* was decided before *Mescalero*.  In the absence of *Mescalero*, the Ninth Circuit likened California's tax to the tax found permissible in *United States v. City of Detroit*, 355 U.S. 466, 78 S. Ct. 474 (1958), in which the Supreme Court upheld a state tax on the privilege of commercially renting property, even though the property in question was owned by the United

---

[10]    In fact, it is not entirely clear that the Indian land at issue in *Fort Mojave* or, especially, in *Agua Caliente* fell within the ambit of § 465 at all.  *See, e.g.*, *Fort Mojave*, 543 F.2d at 1255; *Agua Caliente*, 442 F.2d at 1187 & n.13.

21

States.  At the time that the cases were decided, the Supreme Court in *City of Detroit* and the Ninth Circuit in *Agua Caliente* both viewed a "tax imposed upon the use of property [as] something distinct from a tax imposed upon the property itself."  *City of Detroit*, 355 U.S. at 470, 78 S. Ct. at 476; *Agua Caliente*, 442 F.2d at 1186-87.

But two problems exist with relying on these cases here.  First, the Supreme Court's subsequent decision in *Mescalero* expressly recognized that some uses are so intimately connected with the land that a tax on those uses is essentially a tax on the land, obliterating any categorical distinction between use taxes and property taxes.  *See Mescalero*, 411 U.S. at 158, 93 S. Ct. at 1275-76.

Second, *City of Detroit* is distinguishable in that the source of any tax exemption for the United States was the intergovernmental immunity doctrine, a doctrine that has been "'thoroughly repudiated' by modern case law."  *See Cotton Petroleum*, 490 U.S. at 174, 109 S. Ct. at 1706.  Here, the source of the tax exemption is a federal statute.  Section 465 contains an explicit congressional expression of a tax exemption, the contours of which must be interpreted like any other statute.

So we are not persuaded by Stranburg's reliance on the Ninth Circuit's cases involving California's possessory-interest tax.  Instead, we hold that § 465 bars Florida from assessing its Rental Tax against the Ark Entities.  This construction of

22

the statute more closely comports with what the statutory text actually protects, with what the Supreme Court decided in *Mescalero*, with the purposes of § 465 more generally, and with the general statutory canon that statutes be construed in favor of Indians.   Accordingly, we affirm the district court's order invalidating the application of Florida's Rental Tax to the properties at issue in this case.

## B. Federal Law Preempts the Rental Tax

We could, of course, stop our analysis regarding the Rental Tax at this point, since we have concluded that application of the Rental Tax in this case violates § 465.   But this case raises a matter of first impression, so we also consider the alternative basis that the district court relied on in invalidating the Rental Tax.

Even if § 465 did not expressly preclude assessment of the Rental Tax against the Ark Entities, the Rental Tax is nonetheless preempted by federal law. The district court concluded that the state Rental Tax was preempted because the district court accorded "the full amount of deference available under the law" to a balancing test conducted by the Secretary of the Interior in promulgating regulations governing the leasing of Indian land—including a regulation that prohibits rental taxes.  *Seminole Tribe*, 49 F. Supp. 3d at 1099-100.

On appeal, Stranburg contests this ruling on a number of fronts.   He contends that the Secretary's analysis is entitled to no deference by any court because, in Stranburg's view, it does not purport to decide the preemption

question, it was the product of flawed rulemaking, and it is substantively incorrect. Stranburg also suggests that even if the regulations and analysis must be given weight, that weight should be minimal because the terms of the Ark Entities' leases are controlling.  And finally, Stranburg argues that he prevails on a *de novo Bracker* balancing analysis because the Tribe has not put forth any evidence of its interests while the state has demonstrated its interest in the Rental Tax based on the services it provides on the Tribe's reservations.  Although we decline to accord the regulations deference in conducting a *Bracker* inquiry, we nonetheless find that under a *de novo Bracker* analysis, the Rental Tax is preempted by federal law.

In *Bracker*, the Supreme Court addressed a challenge to Arizona's motor-carrier license and use fuel taxes as applied to non-Indian timber enterprises harvesting timber on reservation land.  448 U.S. at 137-38, 100 S. Ct. at 2580-81.  The Court outlined several general Indian law taxation principles, including "two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members.  First, the exercise of such authority may be pre-empted by federal law. . . . Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.'"  *Id.* at 142, 100 S. Ct. at 2583 (citations omitted).  The Court also "rejected the proposition that in order to find a particular state law to have been preempted by operation of federal law, an express congressional statement to that effect is required."  *Id.* at 144, 100

24

S. Ct. at 2584. Of note, the Court commented that it is "generally unhelpful" to apply existing law regarding federal-state preemption to Indian law preemption. *Id.* at 143, 100 S. Ct. 2583.

As the Court explained, state law is generally inapplicable to on-reservation conduct by Indians, given the overwhelming federal interest in encouraging tribal self-government. *Id.* at 144, 100 S. Ct. at 2584. To analyze the more difficult question of whether state regulation of non-Indian activity on the reservation is preempted by federal law, *Bracker* called for "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.* at 144-45, 100 S. Ct. at 2584.

In turning to Arizona's tax scheme, the Court first considered the federal interests at stake, observing that the "Federal Government's regulation of the harvesting of Indian timber is comprehensive" and citing congressional statutes, Department of the Interior regulations, and day-to-day supervision by the BIA. *Id.* at 145-48, 100 S. Ct. at 2584-86. Indeed, the Court stated, the "federal regulatory scheme is so pervasive as to preclude the additional burdens sought to be imposed" by the state taxes. *Id.* at 148, 100 S. Ct. at 2586. Moreover, the Court reasoned that the state taxes would undermine federal policies of guaranteeing the benefit of timber harvests to Indians, as well as general policies designed to revitalize Indian

25

economies and self-government.  *Id.* at 149, 100 S. Ct. 2586.  For instance, the Court determined that the taxes would complicate the Secretary's setting of fees, reduce tribal revenues, and diminish the profit that potential contractors could realize.  *Id.* at 149, 100 S. Ct. at 2587.

With regard to the state's interest, the Court found none beyond a "general desire to raise revenue."  *Id.* at 150, 100 S. Ct. at 2587.  Nor, as the Court observed, was this "a case in which the State seeks to assess taxes in return for governmental functions it performs for those on whom the taxes fall."  *Id.*, 100 S. Ct. at 2587.  Even though the fuel tax was designed to compensate the state for the use of its highways, the on-reservation roads at issue were neither built nor maintained by the state.  *Id.*  As a result, the Court concluded that the state's generalized interest was insufficient to overcome the comprehensive and pervasive regulation of the harvesting of Indian timber and the threats to federal policies posed by the taxes.  *See id.* at 151, 100 S. Ct. at 2588.

Two years later, the Court decided *Ramah Navajo School Board v. Bureau of Revenue*, 458 U.S. 832, 102 S. Ct. 3394 (1982).  In *Ramah*, the Court struck down New Mexico's gross-receipts tax as assessed on a non-Indian contractor who built a school on the reservation.  *Id.* at 834, 102 S. Ct. at 3396.  The Court found the tax preempted, in part, because the state did "not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of

26

paying this tax." *Id.* at 843, 102 S. Ct. at 3401. While the New Mexico tax was "intended to compensate the State for granting 'the privilege of engaging in business,'" the state had "not explained the source of its power to levy such a tax . . . where the 'privilege of doing business' on an Indian reservation is exclusively bestowed by the Federal Government." *Id.* at 844, 102 S. Ct. at 3402.

The Supreme Court once again applied the *Bracker* balancing test in *Cotton Petroleum*, this time upholding the state tax. In so doing, the Court emphasized that the test is a "flexible one sensitive to the particular state, federal, and tribal interests involved." *Cotton Petroleum*, 490 U.S. at 184, 109 S. Ct. at 1711. In contrasting Cotton Petroleum's situation with those found in *Bracker* and *Ramah*, the Court observed that those two cases "involved complete abdication or noninvolvement of the State in the on-reservation activity," while in *Cotton Petroleum*, New Mexico provided "substantial services" to Cotton Petroleum and the tribe. *Id.* at 185, 109 S. Ct. at 1712. The Court further distinguished Cotton Petroleum's situation by finding that no economic burden fell on the tribe due to the state taxes and that the state did regulate "the spacing and mechanical integrity of [oil] wells located on the reservation," meaning the federal regulations of mineral extraction, while extensive, were not exclusive. *Id.* at 185-86, 109 S. Ct. at 1712. As a result, the Court concluded that the state taxes were not preempted, in part, because "[t]his [was] not a case in which the State has had nothing to do with

the on-reservation activity, save tax it." *Id.* at 186, 109 S. Ct. at 1713. The Court also noted that any marginal effect on the demand for leases that could be attributed to increased state taxes was "simply too indirect and too insubstantial to support Cotton's claim of pre-emption . . . absent some special factor as those present [in *Bracker* and *Ramah*]." *Id.* at 186-87, 109 S. Ct. at 1713.

To summarize, then, *Bracker* requires a particularized inquiry into the federal, tribal, and state interests implicated by a state's tax on non-Indians for on-reservation activity. *Bracker*, 448 U.S. at 144-45, 100 S. Ct. at 2584. Federal statutes, agency regulations, and day-to-day agency supervision can all inform the federal and tribal interests and can also signal a federal regulatory scheme that is so pervasive that it preempts the state tax. *Id.* at 145-48, 100 S. Ct. at 2584-86. A state's interests in a particular tax can outweigh federal and tribal interests, but to do so, the state's tax must relate to services it provides in connection with the entity and activity being taxed and not merely serve a generalized interest in raising revenue. *Id.* at 150-51, 100 S. Ct. at 2587-88.

1. Should the Secretary's Analysis Be Accorded Deference?

Before turning to the merits of the *Bracker* analysis, we must first address what measure of deference, if any, courts should accord to the Secretary of the Interior's *Bracker*-like balancing conducted in the regulatory context. The issue arises because the Secretary of the Interior adopted substantial regulations, made

effective in January 2013, concerning the Secretary's approval and supervision of Indian land leases. *See* 25 C.F.R. Part 162. Included among those regulations is a section entitled "What taxes apply to leases approved under this part?" 25 C.F.R. § 162.017. That section expressly provides that "activities under a lease conducted on the leased premises" are not subject to state taxation, *id.* § 162.017(b), and that "the leasehold or possessory interest" is not subject to state taxation, *id.* § 162.017(c).

According to the regulations' preamble published in the Federal Register, this section was added as "clarification regarding other taxation arising in the context of leasing Indian land." Residential, Business, and Wind and Solar Resource Leases on Indian Land, 77 Fed. Reg. 72,440, 72,447 (Dec. 5, 2012) (codified at 25 C.F.R. pt. 162) ("Preamble"). In this Preamble, the Secretary outlined the *Bracker* balancing test and then applied it generally.

First, the Secretary listed the extensive federal regulations that it said "occupy and preempt the field of Indian leasing." *Id.* at 72,447. The Secretary also analyzed the federal and tribal policies at stake in land leasing and noted that the "ability of a tribe . . . to convey an interest in trust or restricted land arises under Federal law, not State law [and] Federal legislation has left the State with no duties or responsibilities for such interest." *Id.* at 72,447-48. Finally, the Secretary

29

asserted generally that state taxation undermines federal interests with respect to leases. *Id.* at 72,447-49.

The district court concluded that the regulations, including the Secretary's *Bracker* analysis in the Preamble, were entitled to the "full amount of deference available under the law," which it defined as "some deference" short of full *Chevron*[11] deference. *Seminole Tribe*, 49 F. Supp. 3d at 1099-100. Relying on *Wyeth v. Levine*, 555 U.S. 555, 129 S. Ct. 1187 (2009), the district court reasoned that deference was appropriate based on the specialized experience of the Secretary in Indian affairs, the complex and extensive history of federal Indian law, and the thoroughness and persuasiveness of the Secretary's analysis. 49 F. Supp. 3d at 1099-100. Ultimately, the district court held, based on "the reasons detailed by the Secretary of the Interior," that federal regulation of Indian land leasing was so pervasive as to preclude the additional burdens of Florida's Rental Tax and that, "in these circumstances, 25 U.S.C. § 415 and 25 C.F.R. § 162.017 prohibit the imposition of the Rental Tax to the Ark leases." *Id.* at 1100.

We agree with the district court's ultimate conclusion. But to the extent that the district court gave deference to the Secretary's ultimate application of *Bracker* and the agency's conclusion that federal law preempts lease-related taxation, we find that the district court went a step too far. *Bracker* and its progeny call for a

---

[11]    *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984).

*particularized* balancing of the specific federal, tribal, *and state* interests involved. *See Bracker*, 448 U.S. at 145, 100 S. Ct. 2584 ("This inquiry . . . has called for a *particularized* inquiry into the nature of the state, federal, and tribal interests *at stake*, an inquiry designed to determine whether, *in the specific context*, the exercise of state authority would violate federal law." (emphasis added)); *Ramah*, 458 U.S. at 838, 102 S. Ct. at 3398 ("Pre-emption analysis . . . requires a *particularized* examination of the *relevant* state, federal, and tribal interests." (emphasis added)); *Cotton Petroleum*, 490 U.S. at 176, 109 S. Ct. at 1707 ("Instead, we have applied a flexible pre-emption analysis sensitive to the *particular facts and legislation involved*." (emphasis added)).  Because the Secretary's analysis did not examine *Florida's* interests in imposing this particular Rental Tax, the balancing in the Preamble cannot substitute for the particularized inquiry required by *Bracker*.  As for *Wyeth*, although it dealt with preemption outside the context of federal Indian law, that decision observed that while some weight can be given to an agency's views on a state law's impact on a federal regulatory scheme, deference to an agency's ultimate conclusion of federal preemption is inappropriate. *See Wyeth*, 555 U.S. at 576-77, 129 S. Ct. at 1201.

2.  The Federal and Tribal Interests at Stake

This is not to say that the Secretary's analysis is not without value in delineating the federal and tribal interests implicated in the leasing of Indian land.

31

As *Wyeth* noted, an agency's analysis of the regulatory scheme it administers deserves some weight, particularly when the subject matter and history are complex and extensive, and the analysis is thorough, consistent, and persuasive. 555 U.S. at 576-77, 129 S. Ct. at 1201. Here, those factors apply with force. Accordingly, the Preamble analysis and the actual statutes and regulations themselves provide, in this case, substantial evidence of the extensive federal regulation of Indian land leasing to inform the *Bracker* balancing inquiry.

Stranburg raises a number of specific arguments about why deference is inappropriate, but none of those arguments succeed in showing why the Secretary's analysis cannot serve as evidence of the federal and tribal interests involved. Because we have determined that deference to the Secretary's preemption conclusion is inappropriate and will conduct an independent *Bracker* inquiry, we need not address Stranburg's deference arguments in further depth.

Although we cannot defer to the Secretary's ultimate conclusion that federal law preempts the Rental Tax, we nonetheless agree that is the correct conclusion. As in the cases of *Bracker* and *Ramah*, the extensive and exclusive federal regulation of Indian leasing—as evidenced by federal law and regulations— precludes the imposition of state taxes on that activity. *See Bracker*, 448 U.S. at 148-49, 100 S. Ct. at 2586; *Ramah*, 458 U.S. at 841-42, 102 S. Ct. at 3400-01; *see also, e.g.*, 25 U.S.C. § 415; 25 C.F.R. Part 162; Preamble at 72,447-48. Florida has

not shown that the Rental Tax is designed to compensate for any state services or regulations related to the act of renting of commercial property on Indian land; rather, the interests the state advances are more akin to raising revenue for providing statewide services generally.  Accordingly, the *Bracker* analysis leads us to conclude that Florida's Rental Tax is preempted by federal law.

Nor are we persuaded by Stranburg's various arguments that the inquiry should tip in his favor.  Initially, he attacks the pervasive character of the federal regulatory scheme, asserting that *Cotton Petroleum* established that regulation of all lessees of Indian land is not exclusively federal.  *See Cotton Petroleum*, 109 S. Ct. at 185-86, 109 S. Ct. at 1712-13 (holding that the state's regulation of oil-well spacing and integrity meant that federal regulation, while extensive, was not exclusive).  In support of this point, Stranburg contends that the oil and gas leases in *Cotton Petroleum* were subject to the same federal regulations that govern the Ark Entities' leases, and since federal regulation was not deemed exclusive in *Cotton Petroleum*, it cannot be deemed exclusive here.

This argument fails, though, for a number of reasons.  First, *Bracker* requires a particularized balancing of specific interests.  In *Cotton Petroleum*, the Supreme Court pointed to state regulation of oil wells independent of the federal regulations. Stranburg, however, has not pointed to any Florida regulation of the commercial leasing of Indian land or regulation of the activities occurring under the lease.

33

Second, the federal regulations concerning Indian oil leases are separate and distinct from the Indian surface land-leasing regulations. *See* 25 C.F.R. § 162.006(b) (noting that this part of the regulations does not apply to "mineral leases, prospecting permits, or mineral development agreements," which are covered by six separate parts of the Code of Federal Regulations). The regulations cited in *Cotton Petroleum* came from Part 211 of the Code, one of the mineral-leasing parts. *See* 490 U.S. at 186 n.16, 109 S. Ct. at 1712 n.16. Significantly, they were not found in Part 162, the surface-leasing regulations.

Similarly, Stranburg's reliance here on the case of *Gila River Indian Community v. Waddell*, 91 F.3d 1232 (9th Cir. 1996), cannot help him. Contrary to Stranburg's suggestion, *Waddell* did not make a broad pronouncement that the federal leasing regulations were insufficient to preempt all state taxes. Instead, the court found the leasing interests insufficient to preempt a state *sales tax* on non-Indians' attendance at entertainment events on the reservation. *See* 91 F.3d at 1237 ("The Arizona sales tax would not interfere with the use and development of the Tribe's property. Thus, the regulatory scheme that governs the leasing of Indian lands does not require the preemption of the tax.").[12]

---

[12] Of note, *Waddell* did reject the Indians' position that the federal leasing regulations were sufficient to preempt all state taxation generally. 91 F.3d at 1237. Of course, this just means that we are left with a particularized balancing of the leasing interests and the specific tax at issue.

Stranburg next remarks that the federal interest in promoting Indian economic development does not automatically preempt all state taxes when any reduction of Indian income is threatened.  This proposition certainly is true.  *See Cotton Petroleum*, 490 U.S. at 180, 109 S. Ct. at 1709 ("We thus agree that a purpose of the 1938 Act is to provide Indian tribes with badly needed revenue, but find no evidence for the further supposition that Congress intended to remove all barriers to profit maximization."); *id.* at 187, 109 S. Ct. at 1713 (rejecting the notion that "[a]ny adverse effect on the Tribe's finances caused by the taxation of a private party contracting with the Tribe would be ground to strike the state tax."). But this argument goes only so far because the Tribe is not contending that the sole federal interest at stake here is income maximization or that income maximization automatically preempts any state taxation.  Rather, Indian economic well-being is one of the many federal interests embodied in the extensive federal regulation of leasing activity, and it is a valid interest weighing in favor of preemption in the final balance.  *See Bracker*, 448 U.S. at 149, 100 S. Ct. at 2586.

Stranburg further asserts that tribal interest in self-government is not threatened by dual state taxation.  But while the Supreme Court precedent seems clear that dual taxation does not threaten tribal interests, *see Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 114-15, 126 S. Ct. 676, 688-89 (2005), that fact is of limited utility here because the Tribe is not assessing its own rental tax

35

(or even arguing on appeal that the state tax precludes it from doing so). So though the Preamble's general statements expressing concern about the potential of state taxes to "chill" the imposition of tribal taxes cannot support a federal or tribal interest in avoiding dual taxation, Preamble at 72,448, that fact removes little weight from the Tribe's side of the scale here under the particularized circumstances of this case.

Finally, in a variation on the income-maximization argument, Stranburg asserts that any increase in costs for on-reservation projects attributable to the state tax is too indirect for the economic consequences of the tax to support preemption. Of course, it is true that *Cotton Petroleum* held that such indirect burdens were insufficient to support preemption. 490 U.S. at 186-87, 109 S. Ct. at 1713. But *Cotton Petroleum* indicated that such indirect burdens were insufficient "absent some special factor such as those present in [*Bracker and Ramah*]," with that special factor necessarily being the extensive and exclusive federal regulation of the activities at issue in those two cases. *See id.*; *see also id.* at 184-86, 109 S. Ct. at 1711-1713*; see also Bracker*, 448 U.S. at 151 & n.15, 100 S. Ct. at 2587-88 & n.15. As in *Bracker* and *Ramah*, the Tribe is not relying solely on adverse economic impact here; the extensive and exclusive federal regulation of Indian land leasing provides the "special factor" absent in *Cotton Petroleum*.

In sum, the federal government administers an extensive, exclusive, comprehensive, and pervasive regulatory framework governing the leasing of Indian land.  Stranburg's attempt to diminish the value of tribal economic and taxing interests does nothing to minimize the pervasiveness of the federal regulatory scheme, which involves dozens of congressional statutes and federal regulations.  *See, e.g.*, 25 U.S.C. §§ 415 – 416j; 25 C.F.R. §§ 162.001 – 162.703. This scheme is sufficient to bring the federal interests within the scope of *Bracker* and *Ramah*, where "the federal regulatory scheme is so pervasive as to preclude the additional burdens sought to be imposed" by the state.  *Bracker*, 448 U.S. at 148, 100 S. Ct. at 2586; *Ramah*, 458 U.S. at 845, 102 S. Ct. at 3402.  Accordingly, absent a state interest of sufficient weight—and raising revenue for providing statewide services generally lacks that heft—Florida's  Rental Tax is preempted. *See, e.g.*, *Bracker*, 448 U.S. at 148-151, 100 S. Ct. at 2587-88 (conducting an analysis of the state interests after finding the federal scheme was pervasive).

Stranburg cannot alter the results of this analysis through his assertions that the Tribe did not meet its burden[13] of producing any evidence on the federal and

---

[13]    The parties vigorously dispute who bears the "burden" in this case.  Stranburg contends that the Tribe has the "burden of proof . . . to put forth facts showing that federal and tribal interests outweighed the state's interest."  The Tribe fires back that the "burden of justifying the tax in these circumstances rests with the state."  But the *Bracker* inquiry itself imposes no burden-shifting framework.  Any burden necessarily arises from the summary-judgment posture of the case.  Since both parties moved for summary judgment, each had the burden of demonstrating no dispute of material fact that its interests outweighed the other's as a matter of law.  *See generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)

37

tribal interests at stake because it "introduced no record evidence whatsoever of the impact of the Rental tax on the Tribe's business operations or its sovereignty."  In Stranburg's view, the Tribe was required to put forth evidence that "it was less able to lease the property, had to engage in unique marketing efforts, or had to reduce the rent to accommodate the tax."  According to Stranburg, the Tribe's reliance on generalized economic arguments is insufficient to support preemption after *Cotton Petroleum* rejected the indirect-economic-consequences argument.  As discussed above, though, the Supreme Court's rejection of that argument matters only in the absence of an extensive and exclusive federal regulatory scheme.  While such specific economic evidence certainly would have bolstered the Tribe's argument, the regulatory scheme itself is a sufficient federal interest to satisfy the Tribe's burden of production here.

### 3.  The State's Interest at Stake

To establish the state's interest in imposing the Rental Tax, Stranburg points to the evidence he introduced of the services that the state provides on the reservation, including law enforcement, criminal prosecution, and health services, as well as "intangible off-reservation benefits . . . such as infrastructure and

("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (citation omitted)).

38

transportation services."   But none of these services are tied to the business of renting commercial property on Indian land.  Both *Bracker* and *Ramah* note that the state tax must be sufficiently connected to the particular activity taxed to amount to more than just a generalized interest in raising revenue.  *See Bracker*, 448 U.S. at 150-51, 100 S. Ct. at 2587-88 ("[T]his is not a case in which the State seeks to assess taxes in return for government functions it performs for those on whom the taxes fall.  Nor have respondents been able to identify a legitimate regulatory interest served by the taxes they seek to impose."); *Ramah*, 458 U.S. at 843-45 & n.10, 102 S. Ct. at 3401-3402 & n.10 ("We are similarly unpersuaded by the State's argument that the significant services it provides to the Ramah Navajo Indians justify the imposition of this tax. The State does not suggest that these benefits are in any way related to the construction of schools on Indian land.").

Even *Cotton Petroleum*, while finding that some state services were provided to the plaintiff and tribe, affirmed the general principle that the services rendered must be connected to the tax.  *See* 490 U.S. at 185, 109 S. Ct. at 1712 ("Rather, [*Bracker* and *Ramah*] involved complete abdication or noninvolvement of the State *in the on-reservation activity*." (emphasis added)); *cf. id.* at 186, 109 S. Ct. at 1713 ("This is not a case in which the State has had *nothing to do with the on-reservation activity*, save tax it." (emphasis added)).   Here, Stranburg has

39

offered no evidence that Florida is involved in any way with a non-Indian's leasing of commercial property from an Indian tribe on Indian land except taxing it.

Nor can Stranburg's reliance on *Waddell* rescue the state's interest from being insufficient to sustain the tax. The relationship of the services provided to the interest taxed differed materially in *Waddell*. In *Waddell*, the Ninth Circuit concluded that the provision of the law-enforcement services, including crowd and traffic control, "was critical to the success" of the specific entertainment events being taxed. *Waddell*, 91 F.3d at 1238-39. Stranburg has not shown a similar link here.

Stranburg also cites *Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1199-1200 (10th Cir. 2011), for the proposition that off-reservation services can support a state interest. But *Ute Mountain* addressed New Mexico's oil and gas taxes and found that they supported "the off-reservation infrastructure used to transport the oil and gas after it is severed." *Id.* at 1199.

In both of these cases, the tax was clearly and critically connected to the services rendered. While the dollar value of services rendered need not match the amount of taxes paid, *Cotton Petroleum*, 490 U.S. at 185, 109 S. Ct. at 1712, the services and taxes nonetheless must be connected beyond a mere desire to raise revenue. Although the presence of law enforcement or off-reservation roads in some sense makes leasing on-reservation property more attractive, none of the

40

services cited by Stranburg is critically connected to the business of commercial land leasing on Indian property—the activity taxed by the Rental Tax—in the way that crowd and traffic control was to entertainment events in *Waddell* and the use of off-reservation roads was to the transportation of oil and gas from Indian lands in *Ute Mountain*.

In conclusion, we do not defer to the Secretary's ultimate determination of federal preemption because *Bracker* and its progeny require a particularized, case-specific balancing of federal, tribal, and state interests. Nevertheless, Florida's Rental Tax is preempted by federal law under *Bracker*. Federal statutes, regulations, and even the analysis conducted by the Secretary's Preamble demonstrate the pervasive and comprehensive federal regulation of the leasing of Indian land. The State of Florida has not shown any state interest in its Rental Tax beyond the general raising of revenue to provide generalized services nor has it pointed to any state regulation of Indian-land leasing that would render the federal regulations nonexclusive. Consequently, the pervasive federal scheme for regulating Indian land leasing preempts Florida's Rental Tax just as the federal schemes regulating timber and education preempted the state taxes in *Bracker* and *Ramah*.[14]

---

[14]    Stranburg also argues that federal law cannot preempt the Rental Tax as applied to the Ark Entities because the Ark Entities purportedly agreed in their leases to pay all taxes levied. This argument is based on a "grandfather" clause in the federal leasing regulations that provides,

41

## C. Does Comity Require Dismissal of the Rental Tax Challenge?

Stranburg concludes his attack on the district court's Rental Tax ruling by renewing his argument that the district court should have abstained from reaching the merits of the Rental Tax issue in the first place. He mentions in passing that the Tribe "should not be able to create an end-run around" the Tax Injunction Act, 28 U.S.C. § 1341—which would preclude the Ark Entities from bringing a similar federal suit. To the extent that Stranburg is raising a Tax Injunction Act argument against the Tribe on appeal, the argument is foreclosed by Supreme Court precedent. *See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 472-75, 96 S. Ct. 1634, 1640-42 (1976) (holding that Indian tribes can challenge state taxation in federal court despite the prohibitions of the Tax Injunction Act); *see also Osceola v. Fla. Dep't of Revenue*, 893 F.2d 1231, 1234 (11th Cir. 1990). Primarily, though, Stranburg argues that "principles of comity weigh against allowing the Rental Tax claims to proceed."

---

"If we approved your lease document before January 4, 2013, this part applies to that lease document; however, if the provisions of the lease document conflict with this part, the provisions of the lease govern." 25 C.F.R. § 162.008(a). Because the Secretary approved the Ark Entities' leases prior to January 4, 2013, Stranburg contends that the lease provisions should prevail. But there are two problems with Stranburg's argument. First, the lease never specifies that the Ark Entities will pay the Rental Tax. Instead, the lease applies only to taxes generally, so there is no plausible argument that the parties expressly agreed to pay the Rental Tax in the lease or that the lease even conflicts with the federal regulations. But more significantly, if Congress intended for federal law to preempt the Rental Tax, the state lacks authority to levy the tax in the first place. *See Cotton Petroleum*, 490 U.S. at 175-76, 109 S. Ct. at 1707. Despite Stranburg's assertions to the contrary, this logic is not "circular" because the state's authority to levy the tax does not depend on whether the Ark Entities agreed to pay it in the lease, but rather on whether Congress has acted expressly or impliedly to preempt the tax.

42

This issue was raised and rejected at the motion-to-dismiss stage. Stranburg did not renew the comity argument at the summary-judgment stage. More significantly, Stranburg did not include the district court's ruling on the motion to dismiss in his Notice of Appeal, which mentioned just the final judgment order and the summary-judgment order as the rulings appealed.

This Court has determined that it lacks jurisdiction to consider an appeal of an order not specifically mentioned in the appellant's Notice of Appeal. *See Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1528-29 (11th Cir. 1987); *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1374-75 (11th Cir. 1983). "We have previously concluded that, where some portions of a judgment and some orders are expressly made a part of the appeal, we must infer that the appellant did not intend to appeal other unmentioned orders or judgments." *Osterneck*, 825 F.2d at 1529. By the terms of our precedent and under our continuing obligation to examine jurisdiction at every stage of the proceeding, *id.* at 1525 n.5, we conclude that we do not have jurisdiction to address Stranburg's appeal of the district court's order rejecting the comity argument.

But even if no jurisdictional bar existed, we find that the district court did not abuse its discretion when it declined to dismiss the federal suit on comity

grounds.  In the district court, Stranburg primarily invoked *Younger* abstention,[15]
but on appeal, he instead relies heavily on *Levin v. Commerce Energy, Inc.*, 560
U.S. 413, 130 S. Ct. 2323 (2010), a case focused more on the comity doctrine in
the context of federal challenges to state tax statutes.

In *Levin*, the Supreme Court decided that a federal court should decline a
constitutional challenge to allegedly discriminatory state tax exemptions when an
adequate state-court forum is available to decide the challenge.  560 U.S. at 421,
130 S. Ct. at 2330.  In reaching this conclusion, the Supreme Court relied on a
unique confluence of factors: the plaintiff sought federal-court review of
commercial matters over which the state had wide regulatory authority; the suit did
not involve fundamental rights or heightened judicial scrutiny; the plaintiffs were
essentially seeking to improve their own economic position in relation to other
private parties; and, the state courts were more familiar with the state legislative
preferences at stake and were not hampered in the type of remedies they could
administer, unlike federal courts constrained by the Tax Injunction Act.  *Id.* at 431-

---

[15]     *Younger* abstention is a judicial doctrine, named for *Younger v. Harris*, 401 U.S. 37, 91
S. Ct. 746 (1971), where the Supreme Court recognized a limited exception to a federal court's
"virtually unflagging obligation" to exercise its jurisdiction when "extraordinary circumstances"
counsel abstention in favor of pending state proceedings.  *See For Your Eyes Alone, Inc. v. City
of Columbus*, 281 F.3d 1209, 1215-16 (11th Cir. 2002).  *Younger* itself dealt only with attempts
to restrain pending state criminal prosecutions, but the doctrine has been expanded to state civil
proceedings akin to criminal prosecutions or proceedings to enforce state-court judgments.  *See
Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013).  Nevertheless, the Supreme Court
has emphasized that circumstances warranting *Younger* abstention are "exceptional," and the
mere pendency of parallel state proceedings is not itself a bar to federal court litigation.  *See id.*
at 588, 593-94.  None of the exceptional circumstances warranting *Younger* abstention exist here.

32; 130 S. Ct. at 2336. On appeal, Stranburg asserts generally that the same considerations motivating abstention in *Levin* apply here.

Stranburg acknowledges that the Supreme Court has not had occasion to consider *Levin* in the context of federal Indian law, and he admits that the Second Circuit has rejected dismissal on comity grounds when an Indian tribe challenges state taxation. In *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 465-66 (2d Cir. 2013), the Second Circuit concluded that two factors counseled against applying *Levin*'s comity analysis in an Indian case: a strong federal interest in determining the contours of a pervasive federal regulatory scheme, particularly when Congress has favored a federal forum for Indians to vindicate federal rights, and the observed fact that federal courts regularly entertain tribal challenges to state taxation. *Id.* at 466. The Second Circuit also noted that dismissal of the tribe's state-tax challenge on comity grounds would have been the first such dismissal of an Indian tribe's challenge by a federal court ever. *See id.* at 466 n.7. These factors similarly counsel against dismissal on comity grounds here.

Stranburg tries to distinguish *Mashantucket* by pointing out that there, the state-court action was filed two years after the federal action, whereas here, the state action was filed just two days after the federal action. But *Mashantucket* acknowledged only that the state-court proceedings would have merited greater deference if they had been filed *before* the federal proceedings. 722 F.3d at 466

45

n.6.    In any event, the two factors counseling against a comity dismissal in *Mashantucket* do not turn on the filing date of related state-court proceedings.

Beyond the factors in *Mashantucket*, this case presents other facts that distinguish it from *Levin*.    First, the key legal issue here does not involve interpretation of state law, but rather interpretation of federal Indian law, federal statutes, and federal preemption.    Little reason exists to believe that a federal court would be less suited than a state court to adjudicate these issues.    Second, unlike in *Levin*, the Tax Injunction Act would not preclude or constrain any federal remedies because the plaintiff here is an Indian Tribe.    In light of these circumstances, the district court did not abuse its discretion in declining to dismiss the Tribe's Rental Tax claim on comity grounds.

## IV. Florida's Gross-Receipts Utility Tax

Stranburg contends on appeal that the district court also erred in finding that the legal incidence of Florida's Gross-Receipts Utility Tax falls on the Tribe. After careful consideration of the Florida tax scheme, we agree with Stranburg and hold that the legal incidence of the tax falls on the non-Indian utility company. Although the district court did not conduct an alternative *Bracker* inquiry for the Utility Tax, we also find that the Tribe has not established as a matter of law that federal law preempts the Utility Tax.

## A. *Legal Incidence*

The district court concluded that the legal incidence of Florida's Gross-Receipts Utility Tax fell on the Tribe. *Seminole Tribe*, 49 F. Supp. 3d at 1103-08. Relying on *Oklahoma Tax Commission v. Chickasaw Nation*, 515 U.S. 450, 115 S. Ct. 2214 (1995), the district court determined that the Utility Tax was categorically barred as an "impermissible direct tax upon the Seminole Tribe on its reservation." *Id.* at 1108. While both parties' positions have some merit, following a *de novo* review, we conclude that the district court's legal-incidence determination is not the "fair[est]" reading of the Florida taxing scheme, *Chickasaw Nation*, 515 U.S. at 461, 115 S. Ct. at 2221, so we find that the district court erred in placing the legal incidence on the Tribe.

## 1. *Chickasaw Nation* and the Legal Incidence Inquiry

In *Chickasaw Nation*, the Supreme Court considered a tribal challenge to Oklahoma's fuel excise tax.[16]  515 U.S. at 452-53, 115 S. Ct. at 2217.  The tribe contended that Oklahoma's tax fell on the tribe, as retailer of gasoline at its on-reservation convenience stores.  *Id.* at 455, 115 S. Ct. at 2218-19.  The state countered that its tax did not fall upon retailers (and therefore upon the tribe), but rather on the fuel distributors or fuel consumers.  *Id.* at 456, 461-62, 115 S. Ct. at

---

[16]    The *Chickasaw Nation* Court also considered the validity of Oklahoma's income tax, but that discussion is not relevant to our analysis here. *See* 515 U.S. at 462-67, 115 S. Ct. at 2222-24.

2219, 2221-22.  Because the tax did not fall on the tribe, the state argued, its interest in imposing the tax outweighed any incompatible federal or tribal interests. *See id.*

The Supreme Court first recalled that, generally, a state may not levy a tax on an Indian tribe or its members for on-reservation activities.  *Id.* at 458, 115 S. Ct. at 2220.  In the Court's view, "[t]he initial and frequently dispositive question in Indian tax cases, therefore, is who bears the *legal incidence* of a tax."  *Id.* (emphasis added).  The Court specifically rejected a test that would focus on economic realities, finding that legal incidence provided a predictable and certain test for state taxing authorities.  *Id.* at 459-60, 115 S. Ct at 2221.  In doing so, the Court conceded that it would be easy for the state to amend its law and shift the legal incidence by simply "declaring the tax to fall on the consumer and directing the Tribe to collect and remit the levy."  *Id.* at 460, 115 S. Ct. at 2221 (internal quotation marks omitted).

As a result, the legal incidence of a tax is a question of state law.  *See id.* at 460-61, 115 S. Ct. at 2221.  A clear declaration of legal incidence or a mandatory "pass through" provision requiring a tax to be passed on to the consumer is "dispositive language" of legal incidence.  *See id.* at 461, 115 S. Ct. at 2221.  But "[i]n the absence of such dispositive language, the question is one of 'fair interpretation of the taxing statute as written and applied.'"  *Id.* (quoting *Cal. Bd.*

48

*of Equalization v. Chemehuevi Tribe*, 474 U.S. 9, 11, 106 S. Ct. 289, 290 (1985) (per curiam)).

Because the Oklahoma statute did not contain dispositive language, the Court analyzed several factors in concluding that the legal incidence of the fuel tax fell on the tribal retailers. First, the Court observed that the statutory language required the distributor to remit the tax due "on behalf of a licensed retailer." *Id.* at 461, 115 S. Ct. at 2221-22 (emphasis omitted). Second, the Court took into account the fact that the tax was not imposed on sales between distributors, but was imposed on sales from a distributor to a retailer. *Id.* at 461, 115 S. Ct. at 2222. Third, the Court noted the distributor's ability under the law to deduct any subsequently uncollected amount of tax previously paid. *Id.* And fourth, the fact that the distributor was able to retain a small portion of the tax as compensation for serving as the state's tax collector also pointed towards the determination that the legal incidence of the fuel tax fell on the tribal retailers. *Id.* at 462, 115 S. Ct. at 2222. In view of these circumstances, the Court determined that the distributor served as merely a "transmittal agent" for taxes imposed on the retailer. *Id.* at 462, 115 S. Ct. at 2222. The lack of any similar statutory language regarding the relationship between retailers and consumers, the Court concluded, meant that the tax was legally imposed on the retailer. *Id.*

## 2. The Legal Incidence of Florida's Utility Tax Falls on the Utility Company

Florida imposes a tax on the "gross receipts from utility services that are delivered to a retail consumer" in Florida. *See* Fla. Stat. § 203.01(1)(a)(1) (2012). In evaluating where the legal incidence of this tax falls, we consider the framework and language of the statute.

The statute, which is contained in Chapter 203 of the Florida Statutes—a chapter devoted exclusively to gross-receipts taxes (as opposed to, for example, sales or property taxes)—explains that the "tax is imposed upon every person for the privilege of conducting a utility or communications services business, and *each provider of the taxable services remains fully and completely liable for the tax, even if the tax is separately stated as a line item or component of the total bill*." *Id.* § 203.01(5) (emphasis added). Florida's administrative regulations similarly provide that the Utility Tax "is imposed on the privilege of doing business, and it is an *item of cost to the distribution company*," who "remains *fully and completely liable for the payment of the tax, even when the tax is wholly or partially separately itemized on the customer's bill*." Fla. Admin. Code R. 12B-6.0015(3)(a) (emphasis added). While none of this language represents a "dispositive statement" of legal incidence, we find that it points strongly towards a legislative intent to impose the tax on utility companies.

50

In determining that the legal incidence of Florida's Utility Tax fell on the consumer Tribe, the district court relied on § 203.01(4), Fla. Stat., to conclude that "[e]very consumer is required to 'remit the tax' to the utility company as part of the total bill." *Seminole Tribe*, 49 F. Supp. 3d at 1104. On appeal, the Tribe similarly invokes § 203.01(4) in an effort to show that the legislature intended to require the Utility Tax to be passed through to the consumer. But this provision of the statute applies only when the utility service provider has elected to itemize the tax separately on its bills—a choice completely left to the discretion of the service provider. *See* Fla. Stat. § 203.01(4) ("The tax imposed pursuant to this chapter relating to the provision of any utility services *at the option* of the person supplying the taxable services may be separately stated . . . . *Whenever a provider of taxable services elects to separately state such tax* as a component of the charge for the provision of such taxable services, every person, including all governmental units, shall remit the tax to the person who provides such taxable services as a part of the total bill . . . ." (emphasis added)).

Although an itemized amount of the Utility Tax becomes a component of the consumer's bill that is, in a sense, transmitted by the utility to the state once collected, it is key in our view that nothing about this section *requires* a utility provider ever to itemize the tax. Ultimately, then, there is no *requirement* from the legislature to pass the tax through to the consumer, and it is the *requirement* that

matters.  *See Chickasaw Nation*, 515 U.S. at 459-60, 115 S. Ct. at 2221 (rejecting

an "economic realities" inquiry into, among other things, "how completely retailers

can pass along tax increases"); *id.* at 461, 115 S. Ct. at 2221 ("[N]or does it contain

a 'pass through' provision, *requiring* distributors and retailers to pass on the tax's

cost to consumers." (emphasis added)); *see also Wagnon*, 546 U.S. at 103, 126 S.

Ct. at 682 ("While the distributors are 'entitled' to pass along the cost of the tax to

downstream purchasers, . . . they are not required to do so." (citation omitted));

*Chemehuevi Indian Tribe*, 474 U.S. at 10-11, 106 S. Ct. at 289-90; *United States v.*

*State Tax Comm'n of Miss.*, 421 U.S. 599, 608, 95 S. Ct. 1872, 1878 (1975)

("[W]here a State <u>requires</u> that its sales tax be passed on to the purchaser and be

collected by the vendor from him, this establishes as a matter of law that the legal

incidence of the tax falls upon the purchaser." (emphasis added)).[17]

The district court also looked at Florida's administrative regulations and

concluded that, under them, "[i]f the consumer does not remit the tax to the utility

company, then the utility company is not required to pay the tax over to the State."

*Seminole Tribe*, 49 F. Supp. 3d at 1104.  Based on this reasoning, the district court

determined that the utility serves merely as a transmittal agent not unlike the

---

[17]     *Mississippi Tax Commission* did not involve taxes on Indian reservations but rather state taxes of alcohol on military bases.  421 U.S. at 600, 95 S. Ct. at 1874.  There, the Supreme Court found that the legal incidence of the taxes fell on the military purchasers because the distillers were required to include the tax markup in the price, the military purchasers were required to pay the markup to the distillers, and the distillers were required to remit the markup to the tax commission.  *Id.* at 608-09, 95 S. Ct. at 1878.

distributors in *Chickasaw Nation*.  *Id.*   This comparison elides a necessary distinction between an excise tax and a gross-receipts tax, though.

Florida's Utility Tax law taxes receipts of payments.  As detailed in the regulations cited by the district court, though, the utility may elect to pay the tax to the state based on total billings for the month as opposed to total receipts.  *See* Fla. Admin. Code R. 12B-6.005(1)(e)(1).  Because customers do not always pay their bills, the utility is permitted to take a credit or seek a refund of taxes it paid on billings that go uncollected.  *See id.* R. 12-B-6.005(1)(e)(2)-(3).  On the surface, then, this regulation may look similar to the Oklahoma law that permitted a distributor to take a credit for taxes unpaid by the retailer and may create the impression that the utility is in the same position as the Oklahoma distributor.  *See Chickasaw Nation*, 515 U.S. at 461-62, 115 S. Ct. at 2221-22; *Seminole Tribe*, 49 F. Supp. 3d at 1104.

But the nature of Florida's tax necessitates a different result.  The taxable event under the Florida tax is the *receipt of payments*, while in *Chickasaw Nation*, the taxable event was the sale of fuel to the retailer.  *See Chickasaw Nation*, 515 U.S. at 462, 115 S. Ct. at 2222.  Under the Utility Tax law, no tax liability exists until a consumer actually pays the utility something.[18]  Consequently, when a

---

[18]    The district court commented that "in reality, the utility company is only liable for the tax if and when the consumer remits the tax to the utility company as part of the consumer's utility bill." *Seminole Tribe*, 49 F. Supp. 3d at 1104.  The Tribe stresses this point on appeal, arguing

Florida utility takes a credit for uncollected billings, it is seeking a refund to itself of a tax that it never owed in the first place. In contrast, in *Chickasaw Nation*, the tax was still owed by the retailer and any credit sought by the distributor was merely for taxes it prematurely transmitted. Given the nature of the Florida tax, the refund and credit regulations are far less indicative of transmittal-agent status[19] here than in *Chickasaw Nation*.

The district court also put significant weight on a provision of the statute concerning an exemption regarding certain natural-gas customers. *Seminole Tribe*, 49 F. Supp. 3d at 1104-05 (citing Fla. Stat. § 203.01(3)(d)). That provision states that the Utility Tax does not apply to natural-gas sales to a limited class of industrial customers that use the gas as an energy source or a raw material. Fla. Stat. § 203.01(3)(d) (cross-referencing Fla. Stat. § 212.08(7)(ff)(2)). The paragraph further provides that if the exempt consumer gives the utility a written certification of its industrial exemption, the utility is relieved "from the

---

that the utility never pays "out of pocket" if the customer does not pay the tax portion of its bill. The Tribe's argument is true to a point, but it tells only part of the story, as (a) no one is liable for the Utility Tax if the utility never receives payment from its customers, and (b) the utility is liable for taxes on any fraction of payment received. In other words, if a customer chose not to pay the itemized portion of the tax but did pay the rest of its utility bill, then the utility would still owe tax on the smaller amount received. If, for some reason, the utility did not pass along the tax as part of its bill, it would still be required to pay the tax based on the amount it receives from its customers. *See* Fla. Admin. Code R. 12B-6.0015(3)(a)-(b).

[19]    Additionally, in contrast to *Chickasaw Nation*, nothing in Florida law states that the utility remits the tax "on behalf of" its customers, nor does Florida law permit a utility to keep a fraction of the gross-receipts tax as compensation for collecting the tax. *See Chickasaw Nation*, 515 U.S. at 461-62, 115 S. Ct. at 2221-22.

responsibility of remitting tax on the nontaxable amounts, and the department shall look solely to the purchaser for recovery of such tax if the department determines that the purchaser was not entitled to the exclusion." *Id.* From this provision, the district court drew the conclusion that the existence of exemptions based on the identity of the consumer "reveals the legal incidence of the tax is upon the consumer." 49 F. Supp. 3d at 1104-05.

This holding rests upon the notion that consumer-based exemptions illustrate that the legislature implicitly intended the tax to fall on consumers because the exemptions necessarily recognize that the tax can be passed through to consumers. But as with the provision allowing for optional itemization of the bill to reflect the amount of the Utility Tax, recognition that a tax may, or even likely will be passed through to a consumer is not the same as *mandating* that the tax be passed through.[20] To shift the legal incidence to a consumer, *Chickasaw Nation* insists that any pass-through be mandatory.

Similarly, the district court pointed to another provision of Florida's overall gross-receipts tax code that it interpreted as "expressly stat[ing] that no other

---

[20]    In fact, it's hard to imagine any business tax that wouldn't be passed along ultimately to the consumer unless doing so was expressly or economically prohibited. *Cf. Chickasaw Nation*, 515 U.S. at 460, 115 S. Ct. at 2221 (noting the "complicated" relationship between passing along tax increases and sales volume). Or as Ronald Reagan once explained, "Who pays the business tax anyway? *We do! You* can't tax business. Business doesn't *pay* taxes. It *collects* taxes." Manuel Klausner, *Inside Ronald Reagan: A Reason Interview*, REASON, July 1975 (emphasis in original), http://reason.com/archives/1975/07/01/inside-ronald-reagan/print (last visited Aug. 18, 2015). But again, the Supreme Court has been clear in rejecting an economic-realities test in determining legal incidence.

'exemptions or exceptions' apply to the Utility Tax." 49 F. Supp. 3d at 1104-05 (citing Fla. Stat. § 203.04). In the district court's view, the "fact that the Florida legislature provided some exemptions to the Utility Tax, and disavowed many other exemptions, reveals that the legislature intended the legal incidence of the Utility Tax to fall upon consumer," because "[i]f the legal incidence of the tax were on the utility company, there would be no need for the disavowal of most exemptions and exceptions, or the inclusion of others." *Id.*

We respectfully disagree with this conclusion. First, this passage of Florida law merely creates a statutory rule of construction requiring that any tax exceptions or exemptions be clearly expressed by the legislature. Fla. Stat. § 203.04. Second, we discern no inherent incompatibility between placing the *legal* incidence of the tax on the utility provider and tying exemptions from the tax to certain types of consumers. Surely, the legislature can act to encourage certain industries with exemptions that essentially *prohibit* permissive pass-through without making pass-through mandatory. Moreover, the legislature can encourage the utility provider's business through targeted tax exemptions (for example, encouraging the utility to provide services to an underserved area by reducing the taxes on the receipts obtained from those underserved areas) without impacting the legal incidence of the tax.

56

In essence, arguments concerning consumer-based tax exemptions appear to us to conflate legal and economic incidence by viewing economically inevitable pass-through as indistinguishable from legally mandatory pass-through. *See, e.g.*, *Seminole Tribe*, 49 F. Supp. 3d at 1105 ("Under Florida law the tax *is* passed on to consumers, whether it is separately itemized or not . . . ." (emphasis added)). But *Chickasaw Nation* insists on mandatory legal requirements over economic realities, no matter how "automatic" those realities may be.

The district court also contrasts this case with *Wagnon*, where the Kansas statute expressly permitted the distributor to pass on the tax without requiring it to do so. *See Seminole Tribe*, 49 F. Supp. 3d at 1105 (citing *Wagnon*, 546 U.S. at 103, 126 S. Ct. at 682). But the absence of statutory language expressly permitting pass-through of a tax does not equate to a statutory requirement that the tax must be passed through, even when the economic realities of the situation all but make such pass-through automatic. The distinction might be one of form over substance, but the Supreme Court recognized as much was possible when it acknowledged that a state can shift the legal incidence of a tax through wordsmithing. *See Chickasaw Nation*, 515 U.S. at 460, 115 S. Ct. at 2221.

Of course, a pass-through requirement need not be explicitly stated in dispositive language and instead may be fairly interpreted from the statute and its application. *Chemehuevi Indian Tribe*, 474 U.S. at 10-11, 106 S. Ct. at 289-90.

But it must be a *requirement* nonetheless. *See id.*; *Chickasaw Nation*, 515 U.S. at 461, 115 S. Ct. at 2221; *Wagnon*, 546 U.S. at 103, 126 S. Ct. at 682; *Miss. Tax Comm'n*, 421 U.S. at 608, 95 S. Ct. at 1878. Despite the Tribe's emphasis on the inevitability of pass-through, at the end of the day, there is simply nothing in the Florida scheme requiring a utility to pass the tax along to its customers.

Finally, the Tribe attempts to liken Florida's gross-receipts tax to a sales tax, where, generally under Florida law, the legal incidence falls on the consumer. *See Fla. Dep't of Revenue v. Naval Aviation Museum Found., Inc.*, 907 So. 2d 586, 587 (Fla. 1st DCA 2005). And, indeed, Florida's sales-tax statute initially describes the sales tax in a manner similar to the Utility Tax. *Compare* Fla. Stat. § 212.05 ("It is hereby declared to be the legislative intent that every person is exercising a taxable privilege who engages in the business of selling tangible personal property at retail in this state . . . .") *with* Fla. Stat. § 203.01(5) (2012) ("The tax is imposed upon every person for the privilege of conducting a utility or communications services business . . . ."). But this is where the similarities end.

The Supreme Court has recognized that sales and gross-receipts taxes are distinguishable based on the legal incidence of the tax:

> We follow standard usage, under which gross receipts taxes are on the gross receipts from sales payable by the seller, in contrast to sales taxes, which are also levied on the gross receipts from sales but are payable by the buyer (although they are collected by the seller and remitted to the taxing entity).

*Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 n.3, 115 S. Ct. 1331, 1335 n.3 (1995). Florida has embraced this distinction by labeling the Utility Tax as a gross-receipts tax and codifying it in a separate chapter—Chapter 203—from Florida's sales taxes, which are found in Chapter 212.

Beyond the traditional definitions, Florida has also expressly codified that the sales tax must be passed through to, and be paid by, the consumer—something it has not done with respect to the gross-receipts tax. *See, e.g.*, Fla. Stat. § 212.06(3)(a) ("[E]very dealer making sales, . . . *shall*, at the time of making sales, collect the tax imposed by this chapter *from the purchaser*." (emphasis added)); *id.* § 212.07(1)(a) ("The privilege tax herein levied measured by retail sales *shall* be collected by the dealers *from the purchaser or consumer*." (emphasis added)); *id.* § 212.07(4) ("A dealer engaged in any business taxable under this chapter may not advertise or hold out to the public, in any manner, directly or indirectly, that he or she will absorb all or any part of the tax, or that he or she will relieve the purchaser of the payment of all or any part of the tax, or that the tax will not be added to the selling price of the property or services sold or released or, when added, that it or any part thereof will be refunded either directly or indirectly by any method whatsoever.").

Additionally, the State of Florida cannot pursue utility customers for unpaid Utility Tax amounts, while it can pursue purchasers for unpaid sales taxes. Fla.

59

Stat. § 212.07(8); Steffens Dep. 36:16 – 37:19.  The Tribe tries to undermine this point by arguing that having the utility provider remit the tax is merely designed for the "administrative convenience of the state," because it would be too onerous for the state to collect the tax directly from consumers.  But the Tribe's argument does not matter to the issue of legal incidence.  As the Supreme Court noted in *Chickasaw Nation*, a state can intentionally place the legal incidence of a tax on one entity while requiring another entity to collect and remit the levy.  *See Chickasaw Nation*, 515 U.S. at 460, 115 S. Ct. at 2221.

Finally, we observe that Florida also levies a sales tax on electricity, the legal incidence of which falls on the purchaser of electricity.  Fla. Stat. § 212.05(1)(e)(1)(c); *see* Fla. Stat. § 203.01(1)(a)(3); *id.* § 212.06(3)(a).  While separate gross-receipts and sales taxes do not necessarily indicate that the taxes have separate legal incidences, given the traditional usage of those terms and the structure of Florida's tax code, we find the separate taxes more indicative of an intent to impose the legal incidence of the Utility Tax on the utility rather than to place both taxes on the consumer.

This is not to say that the district court's analysis is not valid in other respects, and in fact, the Florida tax does bear some hallmarks of the Oklahoma tax discussed in *Chickasaw Nation*.  For example, just as Oklahoma did not tax sales between distributors in *Chickasaw Nation*, Florida generally does not apply its tax

60

to sales of natural gas or electricity from one utility service provider to another. *See* Fla. Stat. § 203.01(3)(a)(1), (2); Fla. Admin. Code R. 12B-6.0015(1)(b), (2)(c). Nevertheless, we conclude that the "fair[est]" interpretation of Florida's Utility Tax statute as written and applied demonstrates that the state intended the legal incidence of the tax to fall on the utility company.

## B. Is the Utility Tax Preempted Under *Bracker*?

Having concluded that the Utility Tax impermissibly fell on the Tribe, the district court declined to determine in the alternative whether the Utility Tax would be preempted by federal law under *Bracker*. *See Seminole Tribe*, 49 F. Supp. 3d at 1108. Now that we have reached the opposite conclusion, we must determine whether federal law preempts imposition of the Utility Tax on non-Indian utility companies operating on-reservation.[21] After careful consideration, we hold that the Utility Tax does not violate federal law.

---

[21] We assume, for the purposes of our inquiry, that the "taxable event" under the Utility Tax occurs on the reservation. In the district court, Stranburg argued that the taxable event occurred where the utility company physically received its payments. But Stranburg provided no legal authority for this position, nor did he even provide any record evidence indicating where the utility payments were collected. Consequently, the district court determined that the tax was imposed on-reservation and that Stranburg had "forfeited" any argument that the tax was imposed off-reservation. *Seminole Tribe*, 49 F. Supp. 3d at 1107. While Stranburg insists that we need not decide this issue, he contends on appeal that he has not abandoned his argument that the taxable event occurs off-reservation. But Stranburg has still failed to cite legal authority or factual evidence in support of his argument. Accordingly, he has likely forfeited any challenge to the district court's determination. *See Farrow v. West*, 320 F.3d 1235, 1242 n.10 (11th Cir. 2003). Regardless, because we conclude, under the record presented in this case, that the tax is validly imposed on-reservation, the issue is essentially moot.

Whether the Utility Tax is preempted by federal law is ultimately a question of congressional intent. *Cotton Petroleum*, 490 U.S. at 175-76, 109 S. Ct. 1707. Although an express congressional declaration of preemption is not required, the federal and tribal interests at stake must be sufficient to establish that the exercise of the state's taxing authority here violates congressional intent. *See id.* at 176-77, 109 S. Ct. at 1707-08; *Bracker*, 448 U.S. at 144-45, 100 S. Ct. at 2584. Unlike in the case of the Rental Tax, we discern here no pervasive federal interest or comprehensive regulatory scheme covering on-reservation utility delivery and use sufficient to demonstrate a congressional intent to preempt state taxation of a utility provider's receipts derived from on-reservation utility service.

The Tribe asserts that the tax is preempted because the Tribe uses electricity in connection with various activities whose regulation is preempted by federal law, including the provision of essential government services, leasing of Indian land, and Indian gaming. In the Tribe's view, the Utility Tax is indistinguishable from the tax on fuel preempted in *Bracker* because fuel use was essential to the heavily regulated timber activities that preempted the tax, and electricity is essential to all on-reservation activities.

The problem with the Tribe's argument is that it ignores the nature of the *Bracker* inquiry—a "particularized" and "flexible" test "sensitive to the particular state, federal, and tribal interests involved." *Bracker*, 448 U.S. at 145, 100 S. Ct. at

62

2284; *Cotton Petroleum*, 490 U.S. at 184, 109 S. Ct. at 1711.  The fuel tax was preempted in *Bracker* as applied to the timber company because of the extensive federal regulation of Indian timber harvesting.  *Bracker* did not invalidate (or even discuss) the application of Arizona's fuel tax to other on-reservation activities.  Significantly, the Tribe has not introduced evidence of a substantial federal interest in regulating Indians' utility use specifically.  The Tribe essentially expresses a generalized desire to avoid the Utility Tax.  Just as the state cannot assert a generalized interest in raising revenue to support its taxes, the Tribe cannot demonstrate congressional intent to preempt a specific state tax by bundling up an assortment of unrelated federal and tribal interests tied together by the common thread of electricity use.  Because the Tribe does not develop further argument with respect to electricity use in specifically regulated on-reservation activities,[22] we conclude that it has not established that Florida's Utility Tax is generally preempted as a matter of law in this case.

---

[22]    The Tribe's brief contains a non-exhaustive list of activities it asserts are "exclusively and pervasively regulated by federal law," including police and fire protection, land leasing, and gaming, along with references to associated federal statutes.  But the Tribe has failed to demonstrate that the existence of these statutes represents an exclusive or pervasive federal regulation of those activities.  Accordingly, we are not in a position to conduct particularized inquiry with respect to each specific activity listed.  But we offer no opinion on whether, if properly framed, the Tribe may be able to demonstrate that the Utility Tax is preempted with respect to some or all of the specific activities it has listed.

63

## V. Conclusion

In conclusion, we hold that Florida's Rental Tax is expressly precluded by 25 U.S.C. § 465, and, in the alternative, is preempted by the comprehensive federal regulation of Indian land leasing. We therefore affirm that aspect of the district court's order. We further conclude that the district court erred in placing the legal incidence of the Utility Tax on the Tribe and find that, on this record, the Tribe has not demonstrated that the Utility Tax is generally preempted by federal law. Accordingly, we reverse the district court's judgment with respect to Florida's Utility Tax. This case is remanded to the district court for proceedings consistent with this opinion.

**AFFIRMED IN PART and REVERSED IN PART.**